Good morning, Your Honors. Mira Hashmal for Appellants. I'd like to reserve four minutes of my time for rebuttal. We're here because a bankruptcy court erred in allowing this claim. It is a penalty that's unlawful under Arizona law, which all parties agree apply. There is clear error and abusive discretion in not looking carefully at the circumstances of the underlying issue. How much more specific can I get, counsel, in the agreement that says itself that this is a full and final number? The parties have agreed to it. This is what we want to do. Where does it cross into becoming a penalty? I mean, when you're looking at whatever number you wish to come up with, say $50 million, aren't you looking at people that are sophisticated, having an arm's length transaction, and they made an agreement that if there's no interest paid for however many years, that we've agreed that if you don't make the final payment, there will be this amount? Why isn't that arm's length transaction as opposed to what you're calling it a penalty right now? The Arizona Supreme Court in Dobson Bay looked at the restatement, and it said several things. One, that we have to go back beyond the plain language of the contract and look at the actual loss to determine whether or not the amount that's in the contract is really compensable or is actually punitive. It also said the sophistication of the parties isn't really the issue. You look at the agreement itself. In all of the penalty cases, the contracts had that lump sum amount as a late fee or an acceleration. Sometimes they even agreed to stipulated judgments. They're in the documents. The inquiry is whether or not it's funding case. The litigation funder got the vast majority of its capital injection into the law firm's work before the first juror was even sworn in. What we're really talking about here is the 40% contingent interest on the jury verdict. As we all know, there's a big difference between what you get from a jury and what you collect after trial, and this case really exemplifies that difference. Even though they got $110 million, it really wasn't worth the paper it was written on. The debtors had to go all over the country chasing down that judgment debtor. The documents show that all of the parties agree that that 40% contingent interest is not bouncing off the jury verdict. It's bouncing more realistically off what collection will look like. What do we need to look for that? It's the documents themselves. If you look at the restated and amended forward purchase agreement in 2011 and the supplemental agreement in paragraph 7 on disposal of the litigation claim, they agreed they could get bought out for $20 million. So this fiction that they were going to get 40% of 110 is belied by their own documents, which are in the record and were before the bankruptcy court. I didn't mean to interrupt in this important discussion, but I do want to hear your view on the equitable mootness issue, which I think now in light of the motion to dismiss that was filed is something of a threshold issue. CPF cannot meet its heavy burden in seeking dismissal under that, Your Honor, and the reason is because the trial court, the bankruptcy court, is going to have broad discretion to fashion appropriate relief. This issue is just between the debtors and this one creditor. There are no prejudice issues regarding third parties, and if the bankruptcy court decides that a capital transfer needs to come back to the debtors, that's actually going to inure to the benefit of the third parties and other creditors. So there's simply no prejudice that would warrant avoiding a merits decision here, and also there are other appeals coming out of this bankruptcy. So there are going to be other matters that could be back before this bankruptcy court on remand, and they could be addressed in fashioning appropriate relief. But this is a prudential decision we're going to make, and it seems like to me this is important, as you say. We wouldn't have heard from it two weeks before oral argument. We have to get ready for cases, and it just seems to me you're awfully late. This appeal's been sitting around for a long time waiting. Two weeks before, you want us to change the whole ballgame. I wonder if that really is necessary when we only are reviewing it as a prudential review, and I don't see where it's that you're harmed if we go ahead and inherit the case. I agree that the motion was improperly filed, and they didn't meet and confer. They threw it on us two weeks before oral argument, and they're relying on facts that have been in existence for months. They're saying that because the auction happened and the plan was confirmed, the appeals moved. That happened some time ago. It was an 11th hour hail Mary, I think, to avoid a merits review of this dispute, and there's a reason for that. So they agree that they can get bought out for $20 million because that 40% contingent interest is not as big as they claim it is now. More than that, the contemporaneous appraisal from CBRE in December of 2011 puts the parcel when extrapolated out in value at $35 million. Again, they get 40% of that, and what's important in the agreements, if you look at Schedule II, they don't even get paid until the collateral for the underlying judgment is converted into cash. So this is a litigation funder who had to wait, just like the debtors would have had to wait, to sell whatever collateral they got as part of the underlying settlement. I've been shown that you're going to be prejudiced, but if we deny this and go ahead and hear the case. I think we should hear the case. I do, $15 million was due in 2012. $15.5 million is consistent with the contemporaneous appraisal, it's consistent with the buyout provision in their own agreements, and then it escalates in tranches over time. If you look at those tranches, particularly the first one, you see a 30% internal annual interest rate. It's no surprise that 30% interest rate was in Schedule II of one of the underlying agreements. That's what they were going to be paid if the debtors had gotten cash out of that jury verdict as opposed to dirt. So you see what is a really, really fancy version of an agreed principle of $15.5 million subject to interest escalating over time. And where the penalty really hits is December 31, 2015. You're at $38 million, and literally within minutes, seconds, when the clock strikes, suddenly it's ballooned up to $50 million. That's an reasonable reflection of the harm to the creditor. It's not reasonable. There's no way, there's no proportional harm that you can show between December 31 and January 1 to warrant a $12 million escalation in the debt. Isn't the point that these are, the $50,713,000 figure was referenced in the SSA, it was referenced in the outline, it was again referenced in the note, and the discounts along the way, why aren't they just essentially incentives for early payment as opposed to a penalty when the bankruptcy court identified a basis for the $50 million, which was roughly 40% of, you could call it the valuation or you could call it the judgment, but it's in that general zone. I think Your Honor's question has honed in on the true error here. You have the bankruptcy court looking at a valuation in 2017 to determine that $50 million was reasonable in a resolution of this matter back in 2011 and 2012. No one valued this property at that number back then. Ask them. They did their own appraisal in 2016. This is in the docket of the bankruptcy court record at number 77. CPF's own appraiser said the property in 2016 was worth $54 million. This is the 2011 CBRE appraisal? No, there's a second appraisal. It's not in the excerpts of record, but it is in the bankruptcy docket and was before the bankruptcy court. CPF did its own emergency motion and at docket number 77, they submitted a declaration including an appraisal from their own appraiser saying it was worth $54 million. But so are you, to be clear, you're talking about an appraisal that's not in the record on appeal? It's not in the excerpts of record, but it was before the bankruptcy court and it belies the contention that we should be... I'm sorry, go ahead and then I do have a question. We should not be focusing on 2017 value when we're determining what the true deal was with these parties back in 2011. We should be looking at what was that 40% contingent interest. This is not a typical lender environment, right? We've got someone whose capital injection as a litigation funder's already made whole and what we're talking about is the contingent interest. Under the cases, if you look at Aztec film, they talk about penalties can be disguised in many ways and the court has to look past the camouflage. You can call almost anything a discount, but in reality, if you are just fashioning a deal structure that allows you to legitimize a penalty, the court has to look past that as a court in equity and also under Arizona law. The basis for the valuation that you just gave, which was this appraisal that's not in the excerpts of record on appeal, you say it was in the bankruptcy court record. Was it presented at the bankruptcy court as part of the claims objection process? There are two appraisals. If your question's about the CBRE appraisal... My question's about the other appraisal, the CBRE appraisal you have asked us to include in the record. This other appraisal I don't think is in the record and it's not the subject of any motion to supplement the record either. No, but it was properly before the bankruptcy court and it's an admission that TPF has talked both sides of its mouth on valuation. Was it before the bankruptcy court in the claims objection process or it was just simply part of the overall bankruptcy proceeding? It was part of the overall bankruptcy case. It was in connection with an emergency motion for relief from the automatic stay. But when this issue was presented to the bankruptcy court, this specific issue of whether the $50,713,000 was a penalty, did your client bring in front of the bankruptcy court this other second appraisal that you're referencing and try to make this argument that you're making today? I don't believe this specific admission from CPF was raised in that hearing, but it is in the record. It's an admission and it's telling because we're trying to apply hindsight to On top of that, you've got a default interest rate of 35 percent. When you look at it annually, it's over 40 percent. It's completely disproportionate to any harm this lender could, this creditor could ever demonstrate. And they don't even try. And it's, if you look at the cases under Dobson Bay, you have to look, is it proportional? This $12 million late fee kicks in whether they're one day late or one month late, whether they're $2 million short or $30 million short. And then the default interest continues to accrue. There's nothing in this record that suggests a 40 percent interest annually is reasonable compensation, particularly when they've already got the right to get costs, fees and other expenses associated with collection efforts. It shows that it's punitive. And then as a result, under the precedent, should have been disallowed. I'm going to reserve the rest of my time for rebuttal. Thank you. Good morning. Thank you, Your Honor. May it please the Court. My name is Todd Burgess with the Polsonelli Law Firm, and I'm here on behalf of Appellee CPFSA Associates LLC. I think this is a simple case of buyer's remorse, or more specifically, borrower's remorse. When the Association desperately needed money to continue fighting that litigation, they were more than happy to take Ganymede's money. From Ganymede's perspective, it was a risky loan. They were betting on the outcome of commercial litigation, so the potential return had to match the risk. Ganymede loaned Appellant $6.775 million in total in exchange for a promise to get that money back with the premium and plus 40 percent of whatever was recovered in the received a $6 million cash settlement from Desert Ridge Community Association, and they received a $110 million judgment against Northeast Phoenix Partners. They later settled that judgment for commercial property that the bankruptcy court valued at $148 million, and that the appellants argued to the bankruptcy court was worth in the range of $148 million to $196 million. And that doesn't take into account the master development declarant rights, which the appellant's principal said were worth at least as much as the real property. The bankruptcy court ultimately concluded a value of $148 million. And at the same time, she ruled on the claim objection. And what she said was, the true amount of the debt is the $50,713,000 that's reflected in the promissory note, it's reflected in the deed of trust, it's reflected in the second supplemental purchase agreement, and it's reflected in the intercreditor agreement. All the documents were crystal clear that the party's agreement, once the litigation financing deal was essentially completed, they got the judgment, and then the appellant settled the judgment in exchange for the land and the development rights, they sat down with Ganymede and said, okay, Ganymede didn't want to wait. The parties didn't want to wait until the property was developed and sold. Ganymede wanted to get paid. So they negotiated an agreement. They said the number is going to be $50,713,000. That agreement is clearly reflected in the transaction documents that the bankruptcy court interpreted. The bankruptcy court also properly exercised her discretion when she concluded that the 35% interest rate was fair and equitable based on all the facts and circumstances of the case. So... Can I ask you about the interest rate? Because the interest rate is a high interest rate, and we've seen cited to us many cases that have, from the bankruptcy courts, that have disallowed rates that are not even that high. And so what was the basis, what was the finding that this was a fair and equitable interest rate? When the bankruptcy court was determining the interest rate, we had a couple different things going on. We had the claim objection proceeding, which was one contested matter, and then we had the valuation proceeding. And at the same time, they threw in an objection to the pendency interest rate. So in bankruptcy, the pendency interest rate is the interest that accrues from the petition date through the effective date of the plan. The Ninth Circuit law says that after we're on pair, the Supreme Court's decision we're on pair, that bankruptcy courts should look to a presumption of allowability for the contract rate if that rate is enforceable under applicable state law. And that presumption can then be rebutted based on equitable considerations. Well, first, Arizona doesn't ever use re-law. Commercial parties can agree to whatever rate they want as long as it's in writing. So the presumption stands. The court is then deciding this interest rate issue in the context of evaluation. The debtors were proposing a proposed dirt-for-debt plan. They wanted to give CPF back a portion of its collateral, strip the lien from the balance of the collateral, and keep the property for themselves. So the bankruptcy court said, look, you can't tell me, on the one hand, that the property is worth $196 million, and then tell me that CPF as a secured creditor shouldn't get all of their post-petition interest. It's not. Given that big of an equity cushion, the claim was $58 million on the petition date, she found the property was worth, at least the collateral piece on the 96 acres, was worth $121 million. She said, under that circumstance, I don't think it's unreasonable where Ganymede and then CPF who bought the debt said, we're not going to charge interest for a number of years. We're going to give you two and a half years to pay it off early based on these discounts. But if you don't pay it off, and you don't develop the property by a certain date, you're going to have to start paying interest on it. And the bankruptcy court looked at that. She said, that's reasonable. Under all the facts and circumstances of the case, this is a solvent estate. But was there any analysis done of this issue? Because the bankruptcy court seemed to indicate, yes, there were a period and some number of years of interest-free loan, and that the 35% post-petition interest would somehow compensate for that. But was there any analysis done to show that that actually was roughly what the interest would have been if it had been charged at some other interest rate during the period from when the first discount payment was due all the way up until the maturity date? Well, there was no evidence in the record regarding the discount table as to how the parties agreed on the different amounts in the discount table. You've actually had the debt, and the court's looking at the principal amount of the promissory note. And the Ninth Circuit Law doesn't require any type of showing that the interest rate is or is not a market rate of interest. You look to a presumption of allowability because the two sophisticated parties agreed to a rate in writing, and under Arizona law, that's enforceable. And lest it's somehow going to be inequitable to enforce the party's contract, then that's what the bankruptcy court's looking at. I'm sorry, but what is the principal sum to which the 35% interest applies? Is it the full $50 million, or is it what's referred to as the total sum, the total amount? In Section 3.6 of the Second Subliminal Purchase Agreement, I think there's a, I believe there's a misstatement where it says interest will accrue on the total amount. I think that was a clerical error. I think the bankruptcy court looked at the documents as a and she harmonized the provisions to say what was the true intent of the parties here. Was the debt supposed to be the discounted amount? Was it supposed to be the liquidated sum? And I think it was the liquidated sum. At the end of the day, the way CPF calculated its debt, it calculated it based on the principal balance, the full principal balance, less any payments that were made. The bankruptcy appellate panel had a footnote identifying this discrepancy in the documents as to the principal sum to which the 35% should apply under the party's own agreement. Did the bankruptcy court grapple with that issue? I don't believe that the bankruptcy court specifically addressed that. I think she looked at the promissory note and all the other provisions in the document that said this $50 million liquidated sum is fixed, it's non-contingent, and this is the amount the parties agree is owed. I guess the question, though, is in evaluating whether the 35% default rate was legally permissible, do you need to have an understanding of the principal amount to which it applies? Because the bankruptcy appellate panel essentially flagged the issue, but I didn't see any resolution of the issue. Yeah, I think the bankruptcy court took the principal sum based on the face amount of the promissory note. Is there some indication in the record of that? The bankruptcy court holding said the true amount of the debt is $50 million reflected in the promissory note. She didn't go back and say once it matures, I guess the answer is no. She didn't do an analysis of what amount does interest accrue on. Does it start at the $50 million or less the payment? With respect to the cases, counsel was discussing cases regarding penalties. You've been cited to a number of cases. She charged after default. It was an extra charge for a breach of the obligation. That's not the case we have here. If you look at all the penalty cases, whether you look at Dobson Bay, the California test, the scavenger test, the courts are asked to look at situations where there's this discounted payment option. Some courts looked at it and said this is a disguised penalty. Other courts said no, this is a legitimate discount. There's a common theme to those cases. In every one of the cases where the parties had either agreed on the amount of the debt in their settlement agreement or there was some judicially determined judgment or something that set the amount of the debt, in all of those cases, the court said the fact that if you don't take advantage of the discount and you have to pay the full amount of the debt, that's not a penalty. That's just you having to pay what you already agreed you owe. And each of the cases fall into that category. The other cases, you have a debt of, say, $28 million. There's never any agreement about what the total claim was. So you have a disputed claim. They set out for, say, $25,000. And then if they don't pay it on time, it jumps up to $60 or $150. In those cases where there was never any agreement or meeting of the minds about what the amount of debt was, they found it to be a penalty. So the bankruptcy court, I think, looked at this and said, okay, the parties agree that the debt is $50,713,000. So if you don't take advantage of the discount and you have to ultimately pay the total amount of that debt, it's not a penalty. And as the bankruptcy court put it, if I owe you $100 and you tell me that I can pay you $50 if I pay by December 1st and I don't do it, that doesn't mean that you can no longer collect the other $50. It just means that you have to pay what you always owed, which was $100. So I think that's the case we have here. You have two sophisticated parties who negotiated this deal, well-represented on both sides, and they came up with a number. Do you agree that this similar analysis applies to the interest rate that they consider the question is whether it's fairly compensatory or actually some kind of penalty? I don't think so. I don't think that's the standard in ninth-circuit bankruptcy. Again, there's a presumption of allowability for the contracted rate. And the cases say you apply that rate if it's enforceable under state law, which under Arizona it is. Arizona doesn't have a usury statute. Commercial parties can agree to whatever rate they want, as long as they do it in writing. So you start with that presumption. And then it's up to the appellants to rebut that presumption based on the equities of the case. And this is a bankruptcy court who made that decision after 10 days of evaluation trial. She had two years of a bankruptcy case. And she looked at the history of the parties' interactions. She looked at the litigation financing transactions. She looked at the successful outcome of the litigation. She looked at the fact that the debtors were telling her that the property is worth almost $200 million. So I think she put it in her opinion, the debtors incredulously asked me to forget the fact that they just told me this property is worth $196 million and I'm supposed to deny CPF 35% interest. But at some point, shouldn't the court have made more specific findings? Because 35%, I think we all can look at and say that's a pretty high rate of interest for anything. And in so doing, it seems that there's a little bit of a hole. As you've said, the bankruptcy judge considered it. But should there be more specific findings? Or shouldn't there have been more? Because I know we've all said arm's length and sophisticated people, et cetera, et cetera. But should there have been further findings so that we're not guessing right now as to how that was arrived at? Well, I think the burden to create that type of an analysis would rest with the appellants. The debtors in the bankruptcy case never offered any evidence on that issue. They never raised that evidence. They never introduced any sort of other evidence. They just asked the court. They said it's not fair. The rate's not fair. You should disallow it. That's not really enough to carry your burden of proof. So I think the burden in the bankruptcy court was on the appellants to rebut the presumption that the contracted rate of interest was reasonable. As long as you stop to take a breath, I want to ask you a question. We always run into difficulties when we have the bankruptcy appellate panel, which was devised to help the district court, not as an appellate court. In this case, would it be your position that we review the bankruptcy court decision only and that we don't need to get involved with what the BAP did, the bankruptcy appellate panel did? I think that the standard is de novo review for this court of the bankruptcy court's decision. I think the BAP decision is persuasive, but I think the court reviews the bankruptcy court's decision de novo. Okay. Thank you. I just want to make sure I had it right. Appellants argue in their brief that the intent of the parties, the sophistication of the parties, and even the plain terms of the transaction documents are irrelevant to the penalty argument. Appellee disagrees. Under Arizona law, the intent of the parties is paramount when it comes to contract interpretation. The best evidence of the intent of the parties is the plain language of the document. Unless the court looks at a contract and determines that there's some ambiguity, something that didn't occur here, then the court should interpret the contract based on the four corners of the document alone. That's what the bankruptcy court did in this case. She looked at the promissory note. She looked at the deed of trust. She looked at the second supplemental forward purchase agreement and the inter-accreditor agreement. She concluded reasonably that the parties agreed to the amount of the debt, $50,713,000. That was the bankruptcy court's conclusion. It's the only reasonable conclusion supported by the record. To come up with another number, you essentially have to allow the debtors to retrade the deal, which now that once they got the property, they were very eager to get the financing in the beginning, but then once they got the judgment and they got the property, they weren't so eager to pay Ganymede. To what extent is the interest rate issue still a live one in light of the transfer of the property rights that's already happened? That was really the point. I apologize for the late filing of the motion to dismiss for mootness, but that was really the point of it. Maybe it's not so much an equitable mootness. It's just constitutional mootness. At this point, the property was sold to CPF in January for $54 million. Their claim was $58 million on the petition date. The issue of whether or not post-petition interest is allowed in any amount really is moot because they've already bought the property for a credit bid. They're never going to collect that interest. They've received what they're going to receive out of the bankruptcy case, which is essentially, ironically, after all these years, they got the property. They got their collateral back, but they're never going to collect any interest. Whether the court, you could reduce the post-petition interest down to 0%, and it wouldn't matter at this point because CPF has already acquired the property. That was really part of the point of the motion. The same thing on the flip side. If you were to take appellant's arguments at their face, and you start with a debt amount of $15,500,000 back in September 2012, and you apply the contracted interest rate of 35%, which is the contract rate, by the time you get to the date of the auction, the claim is still in excess of $100 million. Given the results of the auction and the fact that CPF has already purchased the property, I don't see where there is any equitable relief. I don't think any equitable relief is warranted here. I think the bankruptcy court's decision was correct in all respects. But at this point, the property's been sold. CPF has the property. The bankruptcy case is virtually concluded, and I think it's moot at this point. Thank you, counsel. There was one issue in the appellant's reply brief that I just wanted to correct the record on or make sure there wasn't any mischaracterization. We had on page 9 or 10 of the brief, there's a statement that effectively STB... Counsel, I think your time is up. I'm so sorry. I don't want to cut you off, but it seems like it's more of a minor issue. If you'd like to... No, no, no. I apologize. I misinterpreted the clock. I lost track of it. My apologies. Thank you. I sometimes thought we should have at the end of one minute on the red button, we'd have a trap door. I'm lucky it's not already in effect, Your Honor. There are so many things that need to be revisited by the bankruptcy court. Some of the issues are the issue of the total amount versus the full penalty with the late amount, right? So there's a big difference between applying the default interest rate to $38 million, which was what was due in December 2015, and applying that to $50 million, which is what happened when the late penalty kicked in. And it is a penalty. And what the courts say is that you don't look at the nomenclature, you look at the effect. The debtor was being punished for missing that payment deadline. It's completely disproportionate to any type of harm. They noticed the trustee sale by April of 2016. And so they're getting $12 million for a harm that's not even a six-month time period between default and when they plan to move forward on the collateral. The entitlement to the default interest assumes they were oversecured. And this is one of the other sort of examples in this case where CPF takes both sides when it suits them, right? So they actually went to the bankruptcy court and said it was worth $54 million. I mentioned that appraisal. That actually ended up being their credit bid, which they forecast for some time in the proceedings. And yet, to get the default interest rate, they wanted the bankruptcy court to rely on what the debtors thought the value of the property was. Well, when it came time for the auction, they did a credit bid of $54 million. So, you know, the irony in all this is that not only was the apparently CPF's appraisal more accurate than ours at the time, but now they've gotten the benefit of the default interest based on an evaluation that was wrong. The other important Can I ask you, your friend on the other side said you could reduce the post-petition interest to zero and it wouldn't change anything because the property has already been transferred as part of the auction process. What's your response or reaction to that? I disagree on several levels. First of all, I think if the court strikes down the unlawful late penalty, we're working off $38 million as of December 15. The legal rate in Arizona is 10%. The STB note sets a market rate of 8% or 6%. So those numbers matter. More than that, there's a dispute as to whether or not the developer rights were properly included in the asset for auction. That is a subject of a pending appeal. So the resolution of that challenge may affect what actually was properly acquired with that credit bid. And either way, even if the property has been transferred, there's an ability to transfer capital back to the debtors to make them whole for the essentially the over-assessment of the value of this claim. The presumption is lost when they come in the door and they want a 35% default interest rate. And so the burden shifted to them because we established under Arizona law that that's a penalty to substantiate it as a reflection of their actual harm, their delay costs. And they didn't come close to meeting that showing. And as a result, the bankruptcy court erred in not having a fully developed record in order to make the equitable decision regarding whether it was reasonable to apply that rate. Thank you. Thank you. This case is submitted and we are now adjourned for the morning. Thank you everyone.
judges: Wallace, Bress, England Jr.